**CLERK'S OFFICE**
**A TRUE COPY**
Nov 13, 2020
s/ Daryl Olszewski
**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information related to a Facebook User ID "Davion Williams" [ID #100024410731607]

)
)
)
)
)
)

Case No.   20   MJ   226

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Sections 844 (i),(n); 2101; 2118(b), (d) | Conspiracy to commit arson; arson of commercial property; interstate travel or use of facility of interstate commerce with intent to riot; burglary involving controlled substances; conspiracy to commit burglary involving same |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

ATF SA Rick Hankins

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means)*.

Date: November 13, 2020

*Judge's signature*

City and state: Milwaukee, WI

Hon. William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

## GRAND JURY MATTER NO. 2020R00324

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant for information associated with the following Facebook user ID: "Davion Williams" [ID #100024410731607], that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.       I am a Special Agent of the United States Justice Department's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.       I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy. That training included various legal courses related to constitutional law as well as

search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4.    In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials.  I am re-certified annually as an ATF CFI. To date, I have participated in over 270 fire scene examinations and have testified as an expert.  Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011.  I have received over 1,400 class hours of fire related training.  Furthermore, I have been an instructor regarding fire-related topics on 38 occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College.  I have also participated in over 200 live fire training exercises, where I started training fires and observed fire growth and development.  Finally, I was a full-time instructor at the ATF National Academy from August 2015 to August 2016, where I taught several topics during

Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5. Through my experience and training as a firearm and arson investigator, I am aware that social media sites, such as Facebook, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that social media sites, such as Facebook, are often used by witnesses to crimes to record criminal activity.

6. As an ATF agent, I have been deployed to riots involving arsons, including the Sherman Park riots in 2016 and the Minnesota riots in 2020. I know from training and experience that individuals who commit crimes during riots commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media, including Facebook.

7. I have previously applied for and received search and arrest warrants related to the crime of arson, as well as other crimes.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of travel in

interstate commerce or use of a facility of interstate commerce with intent to riot, in violation of Title 18, United States Code, Section 2101, conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(n), arson of commercial property, in violation of Title 18, United States Code, Section 844(i), burglary involving controlled substances, in violation of Title 18, United States Code, Section 2118(b), and conspiracy to commit burglary involving controlled substances, in violation of Title 18, United States Code, Section 2118(d).

## FACEBOOK FUNCTIONALITY

10.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

11.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

12.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook

assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device or devices as they interact with the Facebook service on those devices.

14. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also

post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

15. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

16. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored

in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

17. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

18. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

19. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

20. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

21. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

22.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

23.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.  Based on my training and experience, I know that Facebook can provide real-time and historical location information for the device or devices using a Facebook account, including the date and time associated with a latitude and longitude.

24.     Facebook further maintains a functionality it refers to as "Stories," whereby users can post photos and videos using Facebook's "in app" camera, frequently utilizing filters and additional text.  After a user "posts" a "Story," the "Story" will be available to their "friends" for a 24-hour period, appearing at the top of their "News Feed" in the application.

25.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any

payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

26.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining

the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

27.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**PROBABLE CAUSE**

28.     On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and

violent rioting, including numerous arsons throughout the City of Kenosha. The ATF subsequently deployed its National Response Team of arson investigators to Kenosha to process the fire scenes, collect video evidence, and identify potential suspects.

29.     On August 26, 2020, ATF and the Kenosha Police Department conducted a fire scene investigation at Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin.  Investigators located two areas of separate fire damage, one on the outside of the building and one on the inside.

30.     Investigators also collected hours of surveillance videos from multiple locations, including Charlie's 10th Hole bar. The following facts are distilled from relevant video surveillance footage reviewed by law enforcement as part of this investigation.

[Remainder of page left blank purposefully]

31.     On August 24, 2020, at approximately 11:25 pm, multiple people walked southbound on a sidewalk toward Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin.   At approximately 11:26 pm, a male wearing a dark sweatshirt with white lettering used an apparent ignitable liquid to set fire to the north exterior of the bar.  At approximately 11:27 pm, this same group of people reacted to an unknown off-camera event by crouching and looking to the southwest.  In response to that same event, a male in the group, who was wearing a dark hoodie, light shorts, white shoes, and a light colored facemask, removed a handgun from his waistband and fired two rounds toward the southwest.  The male shooter walked with a distinct gait, as his toes pointed outward.  Investigators later recovered spent 9mm ammunition casings on the ground near the area where the shooting had occurred, and the analysis of those casings is ongoing.

32.     At approximately 11:28 pm, an unknown subject from the same group threw a flaming object through the front window of Charlie's 10th Hole bar.  At about this same time, some members of this group began to walk west, across 22nd Avenue, toward a CVS located at 3726 22nd Avenue.

33.     Approximately 14 people unlawfully entered that CVS store at approximately 11:30 pm on August 24, 2020.  The unlawful intruders included a heavyset black male wearing a dark facemask, backwards hat, and a red shirt with "Tom and Jerry" cartoon graphics, as depicted in Figure #1 below.  A second intruder was a male wearing a red shirt, light colored shorts, and a shirt covering his head, as depicted in Figure #2 below.  A third intruder was a black female with frizzy long hair, wearing black leggings and a light colored facemask, as depicted in Figure #3.  A fourth intruder was a white male wearing dark colored camouflage pattern shorts and shirt, depicted in Figure #4 below (alongside the heavyset black male in the "Tom and Jerry" shirt from Figure #1).  A fifth intruder was a male wearing a dark hoodie, light shorts, white shoes, and a light colored facemask (depicted below in Figure #5), which is consistent with the appearance of the individual who discharged a firearm outside Charlie's 10th Hole bar.  Other intruders inside the CVS (but not depicted here) included a black male wearing an orange shirt; a male wearing a yellow sweatshirt; and a suspect wearing a dark hoodie with white lettering that spelled "The Sanneh Foundation," which is a non-profit organization located in St. Paul, Minnesota.



*Figure 1 – Black male wearing Tom and Jerry graphic t-shirt inside CVS.*



*Figure 2 – Intruder wearing red shirt, light colored shorts*



*Figure 3 – Female intruder in CVS
with frizzy hair*



*Figure 4 – White male wearing camouflage shorts and shirt*



*Figure 5 – Suspect from shooting outside*
*Charlie's 10th Hole at CVS*

34.     The Kenosha Police Department responded to the CVS burglary and apprehended Jaquan Moore inside the store while other intruders fled.  Upon arrival, officers observed the bottom half of CVS's glass sliding doors were shattered and entered the building to check for subjects. Multiple people fled, but officers were able to apprehend Moore, who was wearing a white t-shirt around his head and face to conceal his identity, along with a gray shirt and dark pants. Officers located a silver hammer with a black handle and a flathead screwdriver with a black-and-red handle in the immediate area around Moore. Officers noted that cash drawers and pill bottles were

strewn across the floor, and the store was in disarray. The pharmacy section of the CVS had hundreds of pill bottles strewn across the floor, one shelf of medication was tipped over, and the medication refrigerators were opened. CVS pharmacy completed an inventory and found that $1,247.53 of controlled substances and $10,821.42 of non-controlled substances were missing from the store.

35.     For that crime, Moore was charged with burglary, in violation of Wisconsin Statute 943.10(1m)(a), the next day in Kenosha County Case No. 2020CF000973. According to publicly available court records, Moore's full name is Jaquan D. Moore, his date of birth is October 4, 1997, his phone number is (612) 802-8429, and his address is 1014 Rockefeller Lane, Unit 2, Madison, Wisconsin 53704.

36.     ATF later interviewed Moore twice, who eventually acknowledged that he had traveled with a group of people from the Twin Cities in Minnesota on August 24, 2020 to participate in "the riots" in Kenosha, Wisconsin. He said that he was standing next to the person who started the fire at Charlie's 10th Hole bar. Moore said that he left his cell phone in the vehicle of a person known to him as "George." Moore confirmed that the call number assigned to his cell phone is (612) 802-8429. Moore also said there were three vehicles that traveled together from Minnesota to Kenosha: a Dodge car, a white car, and a dark SUV. Moore said he was a passenger in the Dodge car.

37.     Law enforcement was able to locate a suspect Facebook account maintained by Moore: profile name "BackDooe Jq" [ID #100045960943538]. After

reviewing publicly-available photos of the user/owner of this "BackDooe Jq" [ID #100045960943538] account, investigators who were personally familiar with Moore from multiple interviews with him concluded that they were the same person.

38.     During a subsequent canvass of Kenosha, investigators located additional surveillance video from the Stella Hotel located at 5706 8th Avenue, Kenosha, Wisconsin.  Review of this surveillance video showed that a Dodge car, white sedan, and dark SUV parked in the area behind the hotel on August 24, 2020 at approximately 9:30 pm—consistent with Moore's statement.  Four individuals exited the Dodge car: two black males wearing pants; a white male wearing dark colored camouflage shirt and shorts; and a black male with long dreadlocks.  Four males also exited the white sedan.

39.     The most distinct footage was generated of the five individuals exiting the dark SUV.  This footage depicted a black female with frizzy hair exiting the rear passenger area of the dark SUV, depicted in Figure #6 below.  The footage also shows another female exiting from the dark SUV's backseat area (not depicted herein).  A heavyset black male can be seen exiting from the dark SUV's front passenger door, wearing a t-shirt with graphics similar to the aforementioned "Tom and Jerry" shirt, as depicted in Figure #7 below.  A black male with facial hair can be seen exiting the driver door of the dark SUV, wearing shorts, as depicted in Figure #8 below.  Finally, a thin, black male wearing a light colored facemask can be seen exiting the dark SUV's backseat, wearing light colored shorts and white shoes.  This

black male had long dreadlocks that extended down to approximately the middle of his back, and he is depicted below in Figures #9 and #10. This same black male then can be seen putting on a dark hoodie and walking away from the SUV, exhibiting a distinct gate with his toes pointed outward.



*Figure 6 – Rear passenger of dark SUV*



*Figure 7 – Front passenger of dark SUV*



*Figure 8 – Driver of dark SUV*



*Figure 9 – Black male with long dreads, light colored shorts, white shoes that exited the backseat of the dark SUV*



*Figure 10 - Black male with long dreads, light
colored shorts, white shoes that exited the
backseat of the dark SUV*

40.     The dark SUV's license plate was later enhanced and found to be

Nevada plate #798L96, which was assigned to a 2020 Nissan Pathfinder rental car

owned by Hertz corporation.  According to records later obtained from Hertz, the

Nissan Pathfinder was rented by Natasha Bennett at the Minneapolis International

Airport on August 22, 2020 and returned on August 25, 2020.  Investigators initially

believed Bennett was the black female depicted in Figure #6, but later determined

the female in Figure #6 did not match the likeness of Bennett's Minnesota driver's license photograph.

41.     A query of people who have used Natasha Bennett's home address showed that Kannasysha Stevenson (DOB: 8/09/2001) had used the same address as Bennett.  Investigators also located a video of Stevenson on Bennett's Facebook page ["Tasha Gotta Change" ID #100003313833644]. This video from Bennett's Facebook page showed Stevenson with frizzy hair on August 19, 2020, as depicted in the still below as Figure #11.  This same video from August 19, 2020 depicted Stevenson sitting in front of a birthday cake with "Happy Birthday Kannasysha" printed on the cake.  Bennett "tagged" Stevenson in the Facebook posting related to this video using Stevenson's Facebook account name: "NayNay Macc" [Facebook ID #10000503917].



*Figure 7 – Stevenson shown in video on Natasha Bennett Facebook page*

42.     Investigators reviewed the publicly available list of Facebook friends of Stevenson's "NayNay Macc" Facebook account and noted that she was Facebook friends with a Facebook account bearing the username "La Dave Llbd" [Id #100046596046244].  "La Dave Llbd" was also a listed friend for Moore on Moore's Facebook account "BackDooe Jq" [ID #100045960943538].

43.     Furthermore, investigators observed that "La Dave Llbd" was Facebook friends with "Anthony Clay (Stack Bundles)" [ID #100009171689529], who is also a Facebook friend to Moore.  Investigators had previously reviewed a recorded jail call placed by Moore on August 25, 2020, in which Moore instructed the other party on the line to contact "Anthony Clay" via Facebook to retrieve Moore's belongings from Clay, including Moore's wallet, cellphone, and "scripts."  Neither Moore's wallet nor cellphone were on his person at the time of his arrest inside the CVS.  During another call, Moore said that he went into the CVS with others—that the others went in to steal Percocets, but he was the one who was caught. He admitted that he brought a screwdriver with him, but claimed he was unable to steal anything.

44.     While reviewing Stevenson's list of Facebook friends, investigators also identified an account with the profile name "Bullykapper Bubba" [ID #100051201276617].  "Bullykapper Bubba" was observed to be a black male with braided long hair as well as facial hair.  "Bullykapper Bubba" was also a listed

Facebook friend for "Anthony Clay (Stack Bundles)" [ID #100009171689529] and "La Dave Llbd" [ID #100046596046244].

45.     "Bullykapper Bubba" [ID #100051201276617] posted a Facebook live video on September 10, 2020, which depicted a traffic stop conducted by law enforcement. During the traffic stop, the user of the account is identified as "Allen" and a passenger in the vehicle named "Michael" is arrested for an outstanding warrant.  Law enforcement contacted the Hennepin County Dispatch Center in Minnesota and provided them the date, time, and first names "Allen" and "Michael," requesting any related records.  The Hennepin County Dispatch Center reported that at the corresponding date and time, Allen Michael King (DOB: 10/04/1995) was issued a traffic citation and his brother, Michael Valentino King (DOB: 3/28/2000), was arrested for an outstanding warrant.  Allen King's Minnesota driver's license photograph was compared to the image of the user of the "Bullykapper Bubba" Facebook account and law enforcement determined that the images appeared to be of the same person.

46.     A review of the publicly available timeline on Allen King's "Bullykapper Bubba" Facebook page showed various postings suggesting that King, Stevenson, and other associates from Minnesota were included in the group that vandalized Charlie's 10th Hole Bar and burglarized the CVS. First, and as depicted below in Figure #12, King posted that he was with the individuals associated with the Facebook accounts "La Dave Llbd" [ID #100046596046244] and "Get Emdone" [ID #100050512601056] on August 24, 2020 at 3:30pm.  Specifically, King indicated

that he and these other two individuals were on a "money mission." In a "comment" appended to that same posting, King tagged another account, "SF Kevin vs Bullyloc" [ID #100006833267125], and wrote: "twin we woke up on mission." The "SF Kevin vs Bullyloc" account responded by writing "Factz." Law enforcement knows that it takes approximately five hours and thirty minutes to drive from the Twin Cities area in Minnesota to Kenosha, Wisconsin, such that the timing of this post is consistent with the arrival of King's group near the Stella Hotel in Kenosha at approximately 9:30 PM on August 24, 2020.



*Figure 12 – King Facebook Post and Comment Regarding "Money Mission"*

47.     Then, a few minutes later, King posted a link to a news article related

to the officer involved shooting in Kenosha, WI, as depicted below in Figure #13.



*Figure 13 – King Facebook Post Regarding Kenosha Shooting*

48.     Allen King's next Facebook post was a video on his timeline at 9:52 pm

on August 24, 2020, in which he announced that he and his group were in Kenosha,

Wisconsin.  Law enforcement downloaded this video and observed that it depicted

civil unrest.  Figure #14 below is a still image of Allen King, derived from this same

video, wearing a red shirt and another shirt over his head and face, with just his

eyes visible.



*Figure 14 – Still from King Facebook video taken in Kenosha*

49.     Allen King is also seen in this same video with a heavyset black male wearing a red shirt with "Tom and Jerry" graphics, depicted below in Figure #15. The video then pans to show that King was walking with a larger group that included a male in an orange shirt and another male in a yellow sweatshirt. Additionally, King captured images of a black female with frizzy hair, as depicted in Figure #16.  The image of the black female in Figure #16 is consistent with it being Stevenson, and also consistent with the female intruder inside the CVS depicted in Figure #3.



*Figure 15– Heavyset black male wearing Tom and Jerry graphic t-shirt walking with Allen King in Kenosha, WI on August 24, 2020*



*Figure 16 – Kannasysha Stevenson*
*walking with Allen King in Kenosha,*
*WI on August 24, 2020*

50.     Later in the video, King is heard encouraging someone to open a

building and start it on fire, but it is unknown if such action was taken.  Further

along in the video, King is seen walking next to a black male wearing a dark hoodie,

light facemask, light colored shorts, and white shoes, similar to the shooting suspect

from Charlie's 10th Hole bar (see Figure #17). Near the end of the video, King and Stevenson are seen walking back towards a black SUV when King is heard repeating an unknown third party's admonition that, "We need to steal so we can start crashing through shit."



*Figure 17 - Male wearing face mask,
dark hoodie, light colored shorts,
and white shoes*

51.     A further review of King's Facebook page revealed he posted an image of himself and another person wearing the same outfit on August 27, 2020, as depicted below in Figure #18. King "tagged" the account "SF Kevin vs Bullyloc" in this picture and again referred to this person as his "twin." Based on this "tag," it appears as if the user of the "SF Kevin vs Bullyloc" account is a thin, black male with long dreadlock hair. Based on the (i) the consistency between the appearance of the shooter at Charlie's Bar and the appearance of the user of the "SF Kevin vs Bullyloc" account; and (ii) the August 24 posting wherein the user of the "SF Kevin vs Bullyloc" account affirms that he is on a "mission" with King on August 24, 2020, law enforcement believes that the shooter at Charlie's Bar is the user of the "SF Kevin vs Bullyloc" account.



*Figure #18 – King Facebook Post With "SF Kevin vs Bullyloc"*

52.     On August 28, 2020, the Honorable Mary Wagner, of the Kenosha County Circuit Court, signed a search warrant for the historical location information associated with Moore's cell phone number. The listed subscriber for Moore's cell phone number appears to be one of the same people that Moore communicated with during jail calls. A preliminary review of this same location information showed that Moore's phone traveled from Minnesota to Kenosha on or about August 24, 2020, leaving the Twin Cities area at approximately 2:00 pm and arriving in the Kenosha area at approximately 8:50 p.m. Moore's cell phone was then stationary in Kenosha for several hours, including at the time of the arson. (He was arrested on August 24, 2020 at approximately 11:59 p.m.) On August 25, 2020 at approximately 12:22 a.m., Moore's cell phone returned from Kenosha to Minneapolis, Minnesota, arriving at approximately 6:00 a.m. (while Moore was in custody). On August 25, 2020 at approximately 5:21 p.m., the cellular device appeared to have powered off.  Based on this course of travel and the aforementioned jail call wherein Moore directs a third party to retrieve his personal effects from his Facebook friend "Anthony Clay," law enforcement believes that (i) Moore and Clay were in Kenosha together the evening of August 24, 2020; and (ii) Clay came into possession of Moore's personal effects after Moore left his cellphone (and likely other items) in the Dodge car.

53.     On October 20, 2020, ATF Special Agent Rick Hankins downloaded Facebook records for "Anthony CLAY" (ID #100009171689529), pursuant to an already-procured federal search warrant.  These Facebook records contain information indicating that the user of at least one other Facebook account was involved in the crimes described herein. More specifically, on August 24, 2020, at 7:33pm, the user of Facebook account "Davion Williams" (ID #100024410731607) sent "Anthony CLAY" (ID #100009171689529) the following message: "what city yall in." The Clay account responded, "Almost to Milwaukee".  The Williams account sent two messages in reply: "stop at the next gas station" "we need to grab gas".

54.     This communication suggests the user of Facebook account "Davion Williams" (ID #100024410731607) also traveled to Kenosha, Wisconsin on August 24, 2020, in coordination with the user of the "Anthony CLAY" (ID #100009171689529) account. What's more, the user of Facebook account "Davion Williams" (ID #100024410731607) was utilizing Facebook to communicate with at least one member of the group around that same time. The "Davion Williams" (ID #100024410731607) account is therefore likely to have information regarding the group's crimes in Kenosha that evening.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

55.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and

other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

56.     Based on the foregoing, I request that the Court issue the proposed search warrant.

57.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

## GRAND JURY MATTER NO. 2020R00324

**Property to Be Searched**

This warrant applies to information associated with the following Facebook

Accounts "Davion Williams" (ID #100024410731607).

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I.    **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from August 23, 2020, to the present;

(c)    All "Stories" posted by the account from August 23, 2020, to the present;

(d)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from August 23, 2020, to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(e)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(f)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(g)     All other records and contents of communications and messages made or received by the account from August 23, 2020, to the present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(h)     All "check ins" and other location information;

(i)     All IP logs, including all records of the IP addresses that logged into the account;

(j)     All physical location data for the account, including any data collected from electronic devices associated with the account, from August 23, 2020 to the present;

(k)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(l)     All information about the Facebook pages that the account is or was a "fan" of;

(m)     All past and present lists of friends created by the account;

(n)     All records of Facebook searches performed by the account from August 23, 2020, to the present;

(o)     All information about the user's access and use of Facebook Marketplace;

(p)     The types of service utilized by the user;

(q)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(r)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(s)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 10 days of issuance of this warrant.

**II.** **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of travel in interstate commerce or use of a facility of interstate commerce with intent to riot, in violation of Title 18, United States Code, Section 2101, conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(n), arson of commercial property, in violation of Title 18, United States Code, Section 844(i), burglary involving controlled substances, in violation of Title 18, United States Code, Section 2118(b), or conspiracy to commit burglary involving controlled substances, in violation of Title 18, United States Code, Section 2118(d), including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence of the crimes described above;

(b) Preparatory steps taken in furtherance of these crimes;

(c) Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

(d) Evidence of motive, intent, or knowledge of the crimes described above;

(e) Information about the protests, riots, and civil unrest in the Kenosha, Wisconsin area occurring between August 23, 2020 and September 1, 2020;

(f) Evidence about the relationships between the users of these accounts;

(g) Evidence of the location, whereabouts, and patterns of travel of the user of the account;

(h) Appearance, clothing, and identity of the user of the account;

(i) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(j) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(k) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(l) Evidence indicating that any person attempting to obstruct or impede investigations related to arson.